INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNITURE WORKERS, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Lawrence R. Ferriso, Intervenor.

Lawrence R. FERRISO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL–CIO, Intervenor.

ENGINEERS UNION, LOCAL 444, INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNITURE WORKERS, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL–CIO; Lawrence R. Ferriso, Intervenors.

Nos. 93–1373, 93–1380 and 93–1381.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1994.

Decided Dec. 16, 1994.

Laurence Gold, Washington, DC, argued the cause for petitioner Intern. Union of Electronic, Elec., Salaried, Mach. and Furniture Workers, AFL–CIO. With him on the briefs were James G. Mauro, Jr., James Coppess, Mark Schneider, Robert Friedman, and Sheldon Engelhard.

Hugh L. Reilly, New York City, argued the cause and filed the briefs for petitioner Lawrence R. Ferriso.

Frederick C. Havard, Atty., N.L.R.B., Washington, DC, argued the cause for respondent. With him on the brief were Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Jill A. Griffin, Atty., N.L.R.B. Frederick L. Cornell entered an appearance.

Before: EDWARDS, Chief Judge, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

The International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers and its Local 444 (collectively "IUE" or "Union") petition for review of a National Labor Relations Board ("NLRB" or "Board") order holding that the Union breached its duty of fair representation in violation of section 8(b)(1)(A) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(b)(1)(A) (1988). In a reversal of longstanding NLRB policy, the Board de-

termined that a union-security agreement requiring bargaining unit employees to become and remain "members of the Union in good standing" is "ambiguous" and therefore gives rise to a duty to explain to those employees that they need tender to the union only uniform initiation fees and dues. Accordingly, the Board held that IUE had acted in "bad faith" in violation of its duty of fair representation by maintaining such a union-security agreement without informing unit employees of the provision's legal limitations. Lawrence R. Ferriso, an individual bargaining unit employee, also petitions for review, and the NLRB cross-petitions for enforcement.

IUE raises several challenges to the Board's order, most of which we need not reach because we find no substantial evidence, indeed no evidence whatsoever, to support the Board's conclusion that the Union acted in bad faith merely by maintaining a union-security provision that was in conformity with longstanding, well-established Board precedent. Because there is no evidence in the record to support the Board's finding of bad faith, we find no basis for a duty-of-fair-representation violation in this case. We therefore grant IUE's petition for review and deny the Board's cross-petition for enforcement.

■ The Board is free to reconsider its policy regarding the permissible scope of union-security agreements, with an eye toward requiring unions to give full disclosure to employees regarding their right to decline union "membership." In fact, from this date forward unions are on notice that they risk breaching their duty of fair representation if they adopt union-security provisions of the sort at issue here without appropriate "notice" to employees who are covered by such provisions. In the instant case, however, we hold that no violation occurred, because the Union's actions were fully consistent with established law. We also deny Ferriso's petition for review because there is no basis for his claim that the union-security provision at

issue in this case is facially invalid under Supreme Court precedent.

## I. BACKGROUND

### A. *Union–Security Agreements Under the NLRA*

Section 8(a)(3) of the NLRA permits an employer and the employees' exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees wish to become full union members. *See* 29 U.S.C. § 158(a)(3) (1988). While section 8(a)(3) generally makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization," *id.*, that section contains two provisos authorizing union-security agreements between employers and unions. The first proviso of section 8(a)(3) authorizes a union and an employer to contract to require as a condition of employment that all employees in the bargaining unit establish and maintain "membership" in the union. *Id.* The second proviso, however, mandates that such membership must, *inter alia*, be equally available to all and require employees to do no more than "tender the periodic dues and the initiation fees uniformly required." *Id.*

■ Thus, despite the broad meaning that might be implied by the term "membership" in the first proviso of section 8(a)(3), the Supreme Court has held that the second proviso of that section mandates that such union membership is "whittled down to its financial core." *NLRB v. General Motors Corp.*, 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963). It is well settled that causing or attempting to cause an employer to discharge an employee for breach of any union membership requirements other than failure to pay the financial core obligations of uniform initiation fees and dues violates the Act, specifically sections 8(b)(2)[1] and 8(b)(1)(A).[2] *See Union Starch & Ref. Co.*, 87

---

**1.** Section 8(b)(2) makes it unlawful for a union "to cause or attempt to cause an employer to

discriminate against an employee in violation of subsection (a)(3)." 29 U.S.C. § 158(b)(2) (1988).

**2.** Section 8(b)(1)(A) makes it unlawful for a un-

N.L.R.B. 779, 787 (1949), *enforced,* 186 F.2d 1008 (7th Cir.), *cert. denied,* 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951). In its most recent pronouncement in this area, in *Communications Workers v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 2648–49, 101 L.Ed.2d 634 (1988), the Supreme Court held that section 8(a)(3) does not oblige employees "to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." In this way, the Court limited employee obligations under union-security agreements to comport with the congressional purpose of eliminating the problem of "free riders," *i.e.,* employees who would receive the benefits of union representation but refuse to pay their fair share of the costs. *See id.* at 747–54, 108 S.Ct. at 2650–53.

## B. *The Present Dispute*

The facts in this case are straightforward and not in dispute. Since 1970, IUE has been the exclusive collective bargaining representative of a unit of engineering and quality control employees at the New York facilities of Paramax Systems Corporation ("Paramax"), a manufacturer and distributor of electronics and security equipment. Successive collective bargaining agreements between the Union and Paramax have contained the following union-security provision:

> All present employees of [Paramax], and those who in the future enter the bargaining unit, shall join the Union by the thirtieth day following the beginning of their employment, or by the thirtieth day following the effective date of this agreement, whichever is later, and continue to remain *members of the Union in good standing* as a term and condition of employment.

*IUE & IUE Local 444 (Paramax Systems Corp.),* 311 N.L.R.B. 1031, 1031 (1993) ("NLRB Decision") (emphasis added). The most recent collective bargaining agreement, executed on November 25, 1991, is effective from September 6, 1991 until February 3, 1995.

Ferriso joined the Union in 1974 as a full member, but two years later, during a strike at Paramax, he resigned his union membership and crossed the picket line to return to work. Thereafter, Ferriso paid dues as required by the union-security provision, but he declined Union membership. In 1991, Ferriso requested and IUE agreed to reduce his dues pursuant to the Supreme Court's decision in *Beck.* IUE has never sought to discharge or otherwise discipline any employee for failure to comply with the union-security provision. And the parties presented no evidence suggesting that bargaining unit employees have been confused about their obligations under the union-security agreement or that IUE had ever misrepresented to employees the extent of their obligations under the agreement. Indeed, Ferriso's resignation from Union membership in the 1970s suggests that at least he always has fully understood his rights under the law.

In 1991, Ferriso filed unfair labor practice charges with the NLRB, alleging that the IUE–Paramax union-security agreement was facially invalid under the Act in violation of sections 8(b)(1)(A) and (2). On January 15, 1992, the NLRB General Counsel issued a complaint alleging that the Union violated sections 8(b)(1)(A) and (2) by maintaining a union-security clause that "fails to state that the only condition of continued employment ... is the payment of initiation fees and dues." NLRB Decision, 311 N.L.R.B. at 1031 (internal quotations omitted).

## C. *The Board's Decision*

Before the Administrative Law Judge ("ALJ"), the General Counsel first contended that maintaining the union-security clause constituted a *per se* violation of sections 8(b)(1)(A) and (2). In this regard, the General Counsel argued that a "union-security clause—requiring membership in good standing—was facially invalid ... because it failed

---

ion "to restrain or coerce ... employees in the exercise of the rights guaranteed in [section 7 of the Act]." *Id.* § 158(b)(1)(A). Section 7 of the Act gives employees the right to engage in a range of activities in support of collective bargaining, but also gives employees "the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8(a)(3) of the Act]." *Id.* § 157.

to specify that the payment of dues and initiation fees was the only required condition of employment." *Id.* In order for the Union to fulfill its duty of fair representation, the General Counsel contended that it had to "(1) refrain from misleading employees into believing that their union-security obligation was broader than required by law; and (2) eliminate confusion about employee obligations." *Id.* Alternatively, the General Counsel argued that the union-security clause was deficient because its words, "members of the Union in good standing," do not appear in section 8(a)(3) and that those words imply that employees have obligations beyond the payment of periodic dues and initiation fees. *Id.* at 1032.

The ALJ rejected the General Counsel's contentions and dismissed Ferriso's unfair labor practice charge in its entirety because the IUE–Paramax union-security provision conformed to the model union-security clause approved by the NLRB in *Keystone Coat, Apron & Towel Supply Co.*, 121 N.L.R.B. 880, 885 (1958). In *Keystone Coat*, the Board held that union-security agreements lawfully could require that bargaining unit employees, as a condition of employment, become and remain "members in good standing in the Union." *Id.* Since that decision had never been overruled, the ALJ concluded that the Union had not violated the Act by failing to include additional language in the provision. *See* NLRB Decision, 311 N.L.R.B. at 1054 (reprinting ALJ decision).

The NLRB reversed. In light of the purported "widespread sentiment" that employees do not understand their obligations under union-security agreements, the Board decided to reexamine its own policies with respect to section 8(a)(3) and "the attendant rights and obligations it imposes on unions and the employees they represent." *Id.* at 1036–37. The NLRB first found that, because the phrase "members of the Union in good standing" does not explicitly require that employees bear obligations other than those lawfully imposed under section 8(a)(3), the disputed union-security clause was not facially invalid. *Id.* at 1037. However, the Board found that, notwithstanding the decision in *Keystone Coat*, the "members of the Union in

good standing" language is ambiguous because it can be interpreted to require more of employees than is permitted by the Act. *Id.* Having found the language ambiguous, the Board ruled that the Union was obliged pursuant to the duty of fair representation to inform unit employees that their sole obligation under the union-security clause is to pay uniform initiation fees and dues. *Id.* at 1040. Accordingly, the Board majority held that, by maintaining and giving effect to this ambiguous union-security provision without apprising employees of the precise extent of their obligations and rights, the Union had acted in "bad faith" in violation of its duty of fair representation. *Id.* In so holding, the Board overruled its *Keystone Coat* decision to the extent that it authorized union-security clauses requiring membership in the union in good standing. *Id.* at 1041.

The Board also held that IUE had not violated section 8(b)(2) of the Act because it had not taken affirmative steps to cause, or attempt to cause, Paramax to discriminate against employees in violation of section 8(a)(3). *Id.* The Board's order required the Union to cease and desist from "[m]aintaining a union-security clause requiring that, as a condition of employment, Paramax unit employees become and remain 'members of the Union in good standing' without informing those employees that they are only obligated to tender uniform initiation fees (if any) and dues." *Id.* at 1042. Member Devaney, in dissent, would have sustained the ALJ's dismissal of the complaint in its entirety. *See id.* at 1043–51.

## II. ANALYSIS

### A. *Standard of Review*

We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by "substantial evidence," 29 U.S.C. § 160(e), (f) (1988), or that " 'the Board acted arbitrarily or otherwise erred in applying established law to the facts' of the case," *International Union of Petroleum & Indus. Workers v. NLRB*, 980 F.2d 774, 778 (D.C.Cir.1992) (quoting *Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 722 (D.C.Cir.1990), *cert. denied,*

498 U.S. 1053, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991) (internal quotations omitted)). "Pursuant to this standard of review, a 'reviewing court ... does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning....'" *Id.* (quoting *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 42 (D.C.Cir.1980)). In this case, we find that the record does not furnish substantial evidence to support the Board's conclusion that IUE acted in bad faith in violation of its duty of fair representation.

B. *The Board's Duty-of-Fair-Representation Holding*

 It is well established that, as the exclusive bargaining representative of all employees in a bargaining unit, *see* 29 U.S.C. § 159(a) (1988), a union has "a statutory duty fairly to represent all of those employees," *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The principle underlying the judicially created duty of fair representation is that "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* The duty of fair representation is analogous to a fiduciary duty and applies to all aspects of a union's representation of employees. *See Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74–75, 111 S.Ct. 1127, 1133–34, 113 L.Ed.2d 51 (1991).

 In *Vaca,* the Supreme Court assumed, without deciding, that a breach of the duty of fair representation constitutes an unfair labor practice under section 8(b)(1)(A), but rejected the claim that the Board had exclusive jurisdiction over such cases. 386 U.S. at 176–88, 87 S.Ct. at 909–916. Although the Board has continued to enforce the duty of fair representation under the NLRA, "the parameters of this duty remain confusing and unclear." John C. Truesdale, *The NLRB and the Duty,* in THE CHANGING LAW OF FAIR REPRESENTATION 208, 208 (Jean T. McKelvey ed., 1985). At bottom, however, it is generally agreed that a breach of the duty of fair representation "occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916.

The Board's theory in this case is straightforward. The Board found that a union-security agreement requiring unit employees to become and remain "members of the Union in good standing" is "ambiguous" because, "although the clause is capable of a lawful construction, it can be interpreted as requiring more from ... unit employees than is imposed by statute." NLRB Decision, 311 N.L.R.B. at 1037. "Indeed," the Board stated, "it is likely that employees unversed in the intricacies of Section 8(a)(3) and interpretative decisions will literally interpret the clause as requiring full membership and all attendant financial obligations.... At a minimum, they will be confused about their obligations." *Id.* Thus, the Board held that, by maintaining and giving effect to such an agreement without apprising employees that they need only tender to the Union uniform initiation fees and dues, the Union had acted in bad faith in violation of its duty of fair representation. The Board based its holding solely on the "bad faith" prong of the duty of fair representation doctrine; its ruling had no other statutory unfair labor practice component under section 8(b)(1)(A) or any other provision of the NLRA.

 IUE contends that there was no evidentiary basis for the Board's finding of *bad faith* as that term has been defined under the duty of fair representation. We agree. A bad-faith violation of the duty of fair representation "requires a showing of fraud, or deceitful or dishonest action." *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir.1992). Courts have applied a "demanding standard" for finding bad faith under the duty of fair representation, *Swatts v. United Steelworkers,* 808 F.2d 1221, 1225 (7th Cir. 1986), requiring a union's actions toward unit employees to be "sufficiently egregious or so intentionally misleading [as] to be invidious," *O'Neill v. Air Line Pilots Ass'n, Int'l,* 939 F.2d 1199, 1203 (5th Cir.1991) (internal quotations omitted); *see also Alicea v. Suffield Poultry, Inc.,* 902 F.2d 125, 130 (1st Cir.1990)

(requiring for bad-faith violation of duty of fair representation "serious misrepresentations that lack rational justification or are improperly motivated").

There is not one iota of evidence indicating "egregious," "invidious," or "improperly motivated" conduct on the part of IUE in this case. Since its *Keystone Coat* decision in 1958, the Board has accepted as permissible union-security agreements identical to the one at issue in this case. The Board always has held that, so long as a union does not attempt to enforce the agreement beyond its lawful requirement that employees pay only uniform initiation fees and dues, such agreements are perfectly lawful under section 8(a)(3). The record evidence in this case shows only that IUE maintained a union-security agreement that was in conformity with long-standing Board precedent. There is no evidence that the Union advised employees unlawfully with respect to the agreement—indeed, counsel for petitioner Ferriso conceded at oral argument the complete lack of such evidence. Nor is there any evidence that IUE ever attempted to enforce the agreement unlawfully by requesting the discharge or discipline of any employee for failure to pay more than was lawfully required under the provision. Thus, the record is devoid of evidence to support the Board's determination that the Union acted in "bad faith."

The Board contends that its duty-of-fair-representation ruling in this case was merely the result of a retroactive application of a new NLRB policy, announced in an adjudication, regarding the rights and responsibilities of employees and unions under union-security agreements. This new policy, the Board argues, is a reasonable reinterpretation of section 8(a)(3)'s union-security requirements in light of the Supreme Court's decision in *Beck*, which limited the financial contributions unions may lawfully demand from unit employees pursuant to union-security agreements. Thus, the Board claims, its new interpretation of section 8(a)(3) is entitled to deference from this court.

Because there is no factual basis for the Board's finding that IUE breached its duty of fair representation, however, we need not decide the reasonableness of the Board's reinterpretation of section 8(a)(3). We in no way mean to suggest that the Board is not free to reconsider its *Keystone Coat* policy in light of evolving Supreme Court precedent and to conclude that, in the future, unions will be found guilty of a duty-of-fair-representation violation if they adopt "ambiguous" union-security provisions of the sort at issue here without apprising employees of their rights under such provisions. And, as the Supreme Court held in *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974), while there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion, "the Board is not precluded from announcing new principles in an adjudicative proceeding." With few exceptions, "the Board has utilized its historical case-by-case approach, based on *stare decisis,* for prospective application of its holdings." 2 THE DEVELOPING LABOR LAW 1631–32 (Charles J. Morris ed., 2d ed. 1983). Notwithstanding the Board's power to revisit *Keystone Coat* (and adopt a new policy for *prospective* application), however, the facts in this case do not make out a breach of the duty of fair representation, for there is simply no basis in the record to support the Board's predicate finding that the Union engaged in bad faith conduct.

## C. *Ferriso's Petition for Review*

Petitioner Ferriso, the original charging party, claims that the Supreme Court's decisions in *Beck* and *Pattern Makers' League v. NLRB*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985), require a different result in this case. Specifically, he contends that those decisions compel the conclusion that union-security agreements such as the one here at issue are not just ambiguous but rather facially unlawful. In *Pattern Makers,* the Court, embracing the NLRA's "policy of voluntary unionism," held that unions cannot require full union membership as a condition of employment and cannot restrict employees' right to resign from membership in the union. *Id.* at 106–07, 105 S.Ct. at 3071. And, as noted above, the Court in *Beck* held that unions may not exact from unwilling employees, pursuant to union-security agree-

ments, sums used to finance activities that go beyond the union's collective bargaining and representational obligations. 487 U.S. at 745, 108 S.Ct. at 2648. Based on these rulings, Ferriso argues that any union-security agreement requiring "membership in the union in good standing," or even simply "membership in the union," is facially invalid.

Ferriso's contention is without merit. Contrary to his claim, *Pattern Makers* and *Beck* in no way compel the conclusion that union-security agreements requiring "membership in the union in good standing" are unlawful on their face. *Beck* speaks only to the level of dues an employee may lawfully be required to pay under a union-security agreement. *Pattern Makers* stands only for the proposition that unions may not require full union membership as a condition of employment and may not restrict an employee's right to resign from full membership in the union. Neither case has anything to do with what language is permissible in a union-security agreement and, as such, neither case supports Ferriso's claim. Furthermore, there is absolutely nothing in the record of this case to indicate that the Union has ever required full membership as a condition of employment or that the Union has ever exacted from unwilling unit employees sums unrelated to the Union's representational and collective bargaining obligations. Indeed, Ferriso himself resigned from Union membership nearly 20 years ago (with no adverse repercussions) and subsequently secured a reduction in his dues payments. Ferriso's claims are much ado about nothing.

### III. CONCLUSION

Based upon our review of the record as a whole, we conclude that there was no substantial evidence to support the Board's finding of a bad-faith violation of the duty of fair representation in this case. Accordingly, the Union's petition for review is granted, and the Board's cross-petition for enforcement is denied. Ferriso's petition for review is also denied.

*So ordered.*